# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANTONIO D. HENLEY,

       Plaintiff,

   -vs-          Case No. 11-CV-89

DR. RICHTER, JEANANNE ZWIERS,
and NURSE KATHY LEMENS,

       Defendants.

# DECISION AND ORDER

   The plaintiff, Antonio D. Henley ("Henley"), a Wisconsin state prisoner, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*.[1]  He is proceeding on an Eighth Amendment deliberate indifference to a serious medical need claim and a Wisconsin state law medical malpractice claim based on allegations that the defendants did not provide him with medically prescribed rigid contact lenses following a corneal transplant.  Defendants Jeananne Zwiers ("Zwiers") and Kathy Lemens ("Lemens") have filed a motion summary judgment[2], and defendant James Richter ("Dr. Richter"), who is represented by separate counsel, has filed a motion for summary

---

[1] The court requested an attorney to represent Henley pro bono.  The plaintiff's first attorney withdrew due to health reasons.  On June 3, 2012, Attorneys Keith A. Bruett and Andrea J. Fowler of Quarles & Brady, LLP, agreed to represent the plaintiff pro bono.

[2] This motion was originally also brought on behalf of former defendants Richard Raemisch, Cynthia Thorpe, William Pollard, and Jamie Wertel.  However, on January 8, 2013, the court granted the plaintiff's motion to voluntarily dismiss Raemisch, Thorpe, Pollard, and Wertel.

judgment. Additionally, the plaintiff has filed a motion to strike portions of the affidavits of John M. Thompson and Dr. Richter. These motions are ready for resolution and will be addressed herein.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out

2

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. FACTS

### A. Henley's Motion to Strike

Henley has filed a motion to strike portions of the affidavits of Attorney John M. Thompson and Dr. Richter, and corresponding proposed facts. First, he requests that the court strike paragraph 15 of Attorney Thompson's affidavit because it attaches an inflammatory hearsay document. According to Henley, Attorney Thompson lacks personal knowledge of the "investigative report" he attaches as Exhibit N, he is not a records custodian capable of authenticating the report, and the report is inadmissible hearsay.

Paragraph 15 of Attorney Thompson's affidavit provides, "That attached hereto as Exhibit N is a true and correct copy of DAI Investigations materials regarding the plaintiff, Antonio D. Henley, DOC-2135 (12/01), date initiated May 16, 2011, and completion date June 17, 2011." However, Attorney Thompson has not demonstrated through his affidavit that he has the requisite personal knowledge of Exhibit N or that he is capable of authenticating the investigative report. *See* Fed. R. Civ. P. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *see also Scott v. Edinburg*, 346 F.3d 752, 759-60 n.7 (7th Cir. 2003). Thus, paragraph 15 of Attorney Thompson's affidavit and Exhibit N will

3

be stricken.

Second, Henley contends that all portions of Dr. Richter's affidavit that are not based on personal knowledge should be stricken. Specifically, he asserts that paragraphs 3, 4, 5, 11, 12, 13, 14, 19, 20, 21, 25, and 29 contain statements based "upon information and belief" and are therefore improper evidentiary support for summary judgment. He further contends that paragraphs 18, 22, and 23 should be stricken because they are not based on personal knowledge. In response, Dr. Richter contends that Henley's Response to Dr. Richter's Proposed Findings of Fact admits the statements at issue in paragraphs 3, 4, 5, 11, 14, 18, 19, 21, 22, and 23 of Dr. Richter's affidavit and, therefore, his request as to those paragraphs should be denied. Dr. Richter further contends that he has personal knowledge of Henley's health care records because, (1) he contemporaneously prepares the records at the time of his visits with Henley; (2) he reviews the records regularly; and (3) he discusses the same with Henley's other health care providers as part of his evaluation and treatment of Henley's eyes. According to Dr. Richter, his affidavit is based on his direct evaluation and treatment of Henley, his regular review of Henley's pertinent health care records, and discussions with Health Services Unit staff regarding the same. Thus, he contends that the affidavit is based on personal knowledge and should not be stricken. Dr. Richter further contends that Henley's health care records are admissible under Federal Rule of Evidence

4

803(4)[3], as they are made for Henley's medical diagnosis and treatment and describe his pertinent medical history, current symptoms/complaints, and their general cause or lack thereof. Finally, Dr. Richter contends that Henley's health care records are exhibits to his deposition and that the court should not strike those portions of Dr. Richter's affidavit that correspond to the exhibits of Attorney Thompson's affidavit.

Dr. Richter's affidavit is deficient because twelve of its paragraphs are purportedly based on "information and belief" and because it does not otherwise establish personal knowledge as to three additional paragraphs. *See Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000) (an affidavit which asserts various facts "on information and belief" is not enough to satisfy the personal knowledge requirement for summary judgment); *see also* Fed. R. Civ. P. 56(c)(4). However, for the purposes of summary judgment, the court will accept those proposed facts which are based on faulty paragraphs because Henley deems them undisputed in his Response to Dr Richter's Proposed Findings of Fact. Moreover, in his deposition, Dr. Richter established that he has the requisite personal knowledge to attest to the information in his affidavit, based on his reviews of Henley's medical records and conversations with medical staff. Accordingly, the court will not strike the requested paragraphs from Dr. Richter's affidavit.

Third, Henley contends that Dr. Richter's Proposed Findings of Fact Numbers

---

[3] (4) Statement Made for Medical Diagnosis or Treatment. A statement that:

(A) is made for – and is reasonably pertinent to – medical diagnosis or treatment; and

(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

Fed. R. Evid. 803(4).

5

1, 4, 5, and 27, which are based on the improper portions of Attorney Thompson and Dr. Richter's affidavits, should be stricken. Paragraphs 1, 4, and 5 are based on Dr. Richter's affidavit paragraphs that the court is not striking and, therefore, the corresponding proposed facts will likewise not be stricken. Paragraph 27 is based on Attorney Thompson's affidavit paragraph 15, which the court is striking, and it will also therefore strike the proposed fact.

In sum, Henley's motion to strike paragraph 15 of Attorney Thompson's affidavit and Dr. Richter's Proposed Finding of Fact 27 will be granted. Henley's motion to strike paragraphs 3, 4, 5, 11, 12, 13, 14, 18, 19, 20, 21, 22, 23, 25, and 29 of Dr. Richter's affidavit, and Dr. Richter's Proposed Findings of Fact 1, 4, and 5 will be denied.

### B. Relevant Undisputed Facts[4]

Zwiers was the Health Services Unit ("HSU") Manager at Green Bay Correctional Institution ("GBCI") at all times relevant. Her duties include management and supervision of health care services provided. Zwiers does not have the authority to overturn the treatment decisions of a treating physician and she does not control the details of a physician's practice or act in a way contrary to his treatment decisions. However, Zwiers has considerable latitude in her position, including the ability to bypass the warden and contact the Bureau of Health Services when she has any concerns regarding patient care. Zwiers has previously reported concerns over a physician's care of inmates at GBCI.

Lemens was a Nurse Clinician in the GBCI HSU at all times relevant. Her

---

[4] This section is taken from Zwiers and Lemens' Proposed Findings of Fact, Dr. Richter's Proposed Findings of Fact, and Henley's Proposed Findings of Fact.

6

responsibilities include patient assessment and treatment, assisting the physician in providing medical services, management of medications, provision of emergency care, and maintenance of medical records. Lemens does not have the authority to overturn the treatment decisions of a treating physician and she did not control the details of a physician's practice or act in a way contrary to his treatment decisions. However, Lemens can discuss patient care issues directly with the treating physician and, if necessary, escalate her concerns to Zwiers, who can – and in the past has – taken those concerns to higher authorities to correct the problem.

Dr. Richter is an optometrist who has been licensed to practice in Wisconsin since 1973. He provides optometry care to inmates in correctional facilities throughout northeast and north central Wisconsin.

In 1997, Henley was diagnosed with bilateral keratoconus. Prior to November 16, 2009, Henley underwent a left eye corneal transplant.

## 1. Medical Care of Henley

Henley arrived at GBCI on September 1, 2009. On November 16, 2009, he underwent a corneal transplant on his right eye at the University of Wisconsin Hospital and Clinic in Madison, Wisconsin. The ocular surgeon who performed the second corneal transplant, Dr. Neal Barney, instructed Henley to continue wearing a contact lens in the non-surgical, left eye.

On his return from the hospital to GBCI that same day, Nurse Komorowski evaluated Henley. During this period of his recovery, Henley wore a soft contact lens in his

7

left eye as directed by Dr. Barney. He did not, and could not, wear a contact lens in his right eye, until the stitches were removed.

On March 16, 2010, Henley was seen at the UW Eye Station by Robert Lazorik, for evaluation of contact lenses by referral of Dr. Barney. Lazorik noted that Henley was wearing disposable soft contact lenses and that he reported occasional discomfort with the contact lenses. Lazorik found no irritation secondary to the contact lenses and recommended that Henley continue to wear the soft contact lenses daily. He also recommended discontinuing the lenses if Henley experienced pain, discharge, or sudden changes in vision. Lazorik recommended monthly replacement of the contact lenses.

Pursuant to Bureau of Health Services Policy 300.02, a consulting physician may make recommendations concerning a course of treatment for an inmate. If the DOC prescribing practitioner writes orders different than recommendations of the consultant:

> a. The DOC-3528 form must be completed and forwarded to the specialty consultant if consultant's recommendation involves a significant recommendation (eg.; transplant evaluation, treatment for hepatitis C, etc.), versus a recommendation for comfort items or changes in medications, and presribing practitioner does not follow the recommendations.

> b. File a copy of the DOC-3528 in the Medical Chart, in the Consultation Section, in front of the corresponding DOC-3001.

(Bruett Aff. ¶ 5, Ex. 4 at 5.)

Lemens saw Henley on March 30, 2010, who reported his right eye was itchy, and that he felt the stitches were loose. Lemens told Henley she would consult with the

8

physician in the morning and follow-up with him. Lemens placed a call to the UW Eye Station on March 31, 2010, and left a message.

On April 7, 2010, a contact lens was dispensed to Henley per his request. On April 9, 2010, Lemens saw Henley again regarding his concerns. Lemens noted that Henley had been using the soft contacts for nine months and, when asked what problems he was having, he was evasive. Lemens told Henley that if the contact ripped he should keep it and file a health services request form. She also told him she would check and try to assist with further problems and care.

On April 23, 2010, Henley had a follow-up appointment with Dr. Richter at GBCI's HSU. Henley's vision was as follows: 20/30, Left eye (with contact lens); and 20/400, Right eye (without any corrective lens). Dr. Richter determined that Henley's right eye had not yet healed fully from the corneal transplant. He also determined that Henley's contact lenses were not "medically necessary" and would therefore be replaced with glasses. Henley still had sutures in his right eye which prohibited him from wearing a contact lens in his right eye. Dr. Richter discontinued Henley's prescription for contact lenses and ordered slightly tinted glasses. Dr. Richter was concerned, given the at times violent environment that exists at GBCI, that Henley's safety would be jeopardized if he wore a contact lens. Moreover, refraction indicated that Henley's vision improved with the glasses prescription as follows: 20/20, Left eye; and 2/25, Right eye.

Nurse Jamie Wertel attempted to dispense the glasses to Henley on May 10,

9

2010. During this appointment, Henley asked whether he could have his contact lenses in his cell with him. Lemens, who was also present, explained to him that Dr. Richter had reviewed his record and determined the contacts were no longer needed, discontinued the contacts, and ordered glasses. Henley's contact lenses were confiscated. He refused the glasses because Dr. Barney had told him to continue wearing contacts, and left the appointment. Nurse Wertel noted that she would check with the Bureau of Health Services on how to handle the refusal of the glasses.

Immediately after GBCI attempted to replace Henley's contact lenses with glasses on May 10, 2010, Henley wrote a letter to Zwiers explaining the situation and Dr. Barney's treatment plan. On May 12, 2010, Henley filed an Interview/Information Request in which he wrote that he wanted it stated on record that HSU staff was forcing him to walk around not being able to see because his contacts were discontinued. Nurse Wertel responded to the request and noted that HSU ordered glasses but he refused them and that Dr. Richter had discontinued the contact lenses. Nurse Wertel told Henley to contact her if he wanted the glasses.

Lemens met with Henley on May 13, 2010, and she again attempted to explain to him that Dr. Richter had discontinued the contact lenses and ordered the glasses. She offered Henley the glasses, but he again refused them stating, "I'll just walk around and not be able to see." Lemens noted that Henley was being argumentative and would not listen to her. Lemens also noted Henley's desire to see his "doctor in Madison," presumably Dr.

10

Barney.

Lemens saw Henley was seen by on May 14, 2010, for his complaints of eye irritation and drainage. She found no obvious drainage or irritation evident and scheduled Henley for a follow-up for evaluation of his complaints.

On May 17, 2010, Lemens followed-up with Henley for his complaints of eye irritation and drainage. Nurse Wertel was present at the exam. Lemens found no redness, drainage, or irritation to the right eye. His eye lids were not warm or sensitive to light. Henley complained of blurriness in his right eye. After discussing the reason for the glasses, and a review of the UW medical records in the chart, Henley agreed to take the glasses and try them until he saw Dr. Richter. Later that day, Henley filed a Health Services Request stating, "I can't wear them and plus they make my head hurt. I tried them out."

Henley returned the glasses because he continued to suffer from distorted vision that induced painful headaches. Similar problems persisted for Henley when he had no corrective lenses – his vision was distorted to the point that he could barely function and he experienced intense and painful headaches. Henley continued to suffer from severely limited vision and debilitating headaches after Dr. Richter and the GBCI HSU staff refused to implement Dr. Barney's treatment plan.

On May 17, 2010, Nurse Wertel responded to Henley's May 10, 2010, letter to Zwiers. Nurse Wertel noted that Henley had accepted his glasses during his appointment that day and that Dr. Richter prescribed the glasses to correct his vision in accordance with

11

DOC policies. Nurse Wertel told Henley an appointment was scheduled for him to see Dr. Richter in early June and encouraged him to wear the glasses as much as possible to get used to the prescription so that he could discuss any issues with the prescription with Dr. Richter.

Nurse Wertel responded to Henley's Health Services Request on May 18, 2010. She informed him that a follow-up with Dr. Richter had been scheduled and encouraged him to work with Dr. Richter to find a correct eyeglass prescription. Nurse Wertel stated that the brief period of time that Henley tried the glasses (less than one day) may not have been enough for Dr. Richter to provide alternatives. She told Henley that HSU would keep the glasses in case he changed his mind and wanted them again.

Each time that Lemens – or any other member of the GBCI HSU- examined Henley, he informed them about Dr. Barney's treatment plan for continued use of contact lenses, a point that was noted in Henley's Progress Notes on May 19, 2010.

On June 4, 2010, Henley returned to the HSU and saw Dr. Richter for a follow up appointment. Dr. Richter noted that his right eye showed no corneal epithelial straining, the tissue was clear, the anterior chamber was quiet and there were no signs of any inflammation or corneal rejection. In other words, there was no objective evidence that supported Henley's complaints of eye irritation and blurriness. He still had sutures in his right eye left over from the corneal transplant. Dr. Richter advised Henley that it was still appropriate for him to wear the glasses that he had previously prescribed.

By at least June 4, 2010, Dr. Richter was aware that Henley had reported

12

symptoms of blurry vision and was filing frequent complaints about his eye care. Dr. Richter was aware that either Henley or the nursing staff had described his eyes as "really bad now." (Bruett Aff. ¶ 2, Ex. 1 at 104:15-18.) Dr. Richter never tried to contact Henley's surgeon.

On July 13, 2010, Henley had a follow-up appointment with Dr. Barney at University Station Clinic in Madison, Wisconsin. Half of the corneal sutures were removed from his right eye. Dr. Barney noted that corneal transplants "almost invariably come with some irregular astigmatism and do not permit fully correctable vision with spectacles alone." (Thompson Aff. ¶ 7 and Richter Aff. ¶ 17). Dr. Barney determined that Henley was not yet ready to wear a contact lens in his right eye since sutures from the corneal transplant remained.

On his return to GBCI, Nurse Komorowski examined Henley and noted that his right eye sclera was red but with no drainage. Nurse Komorowski also noted that the chart would be forwarded to the physician and Dr. Richter.

After learning of Henley's situation, Dr. Barney wrote a letter directly to the GBCI HSU and Dr. Richter on July 15, 2010, stating:

> I want to be clear about the routine medically indicated care of patients with keratoconus and corneal transplant:
>
> 1. Routine Care of patients who undergo corneal transplant for keratoconus involves the medically indicated use of rigid contact lenses following transplant. The transplants almost invariably come with some irregular astigmatism and do not permit fully correctable vision with spectacles alone.
>
> …

13

> I believe that our records here would indicate that Mr. Henley will see best with contact lens use. We would need sometime further to removed [sic] all of his sutures out of his right eye in order to permit fitting for that eye, but at present, at least, left eye contact lens wear is medically indicated for his best vision.

(Zwiers Aff., Dkt #36-3 at pp. 3-4 of 29.) Dr. Barney's July 15, 2010 letter to the HSU and Dr. Richter went into Henley's GBCI medical file.

Dr. Richter said he agreed a "hundred percent" with the surgeon's July 15, 2010 letter specifically telling Dr. Richter that a contact lens was the routine, medically indicated care for patients with keratoconus corneal transplants. He stated: "I'm agreeing with statement in terms of if you have irregular astigmatism you cannot get the good vision with glasses. Contact lenses is obviously the choice." (Bruett Aff. ¶ 2, Ex. 1 at 121:10-15.) Dr. Richter also stated that he would never consider sending Mr. Henley to Madison to be fitted with a left lens before he could be fitted with a right lens because doing so would be expensive. Dr. Richter stated: "Q. So these trips are pretty expensive? A. Yeah. Q. Okay. A. Plus we have to pay for them at that time. If they fit two lenses at the same time, he does it at the same time, why would we even consider that? And I told Mr. Henley that." (Bruett Aff. ¶ 2, Ex. 1 at 123:8-14.) Dr. Richter did not provide Henley with a new left contact lens when he received the ocular surgeon's letter. Dr. Richter admits that he decided against fitting a lens in Henley's left eye because, in part, fitting only the left eye was "going to cost everybody a lot of money." (Bruett Aff. ¶ 2, Ex. 1 at 122:24-123:3.)

On July 28, 2010, Henley was seen by Nurse Komorowski for complaints of

14

eye irritation in his right eye. No optometrist was on-site, so she contacted Dr. Heidorn, the regular GBCI physician, who ordered Polymixin B Sulfate and trimethoprim. Henley refused Dr. Heidorn's prescriptions and started to walk out of the HSU. Nurse Komorowski then called Dr. Richter, who directed that Henley should be given the Polymixin B Sulfate and trimethoprim that Dr. Heidorn had ordered and that he should be scheduled for an eye appointment to assess for any loose sutures.

Due to Henley's ongoing eye complaints, on August 6, 2010, Dr. Richter recommended that he be moved to Dodge Correctional Institution ("DCI") in Waupun, Wisconsin, since there was a full-time optometrist present at the facility. Zwiers placed a call to the DCI Health Services Manager on August 11, 2010, to discuss Henley's optical care needs. On August 23, 2010, Zwiers met with Henley regarding his upcoming transfer to DCI. Henley was upset. Zwiers tried to explain to him that the transfer was temporary and encouraged him to cooperate. Henley stated, "I ain't cooperating with nobody." He was transferred to DCI on August 31, 2010.

Shortly after Henley's August 31, 2010 transfer to DCI, Dr. Barney wrote another letter, this time directly to Henley, substantiating the need for contact lenses:

> This letter is to substantiate your need for the use of rigid gas permeable contact lenses in order to achieve your best vision. You have post corneal transplant irregular astigmatism in both eyes. The irregular astigmatism can not be fully corrected with glasses alone. For this reason, rigid gas-permeable contact lenses are medically indicated to reduce this irregular astigmatism and allow you your best corrected vision. Glasses alone will not allow your best corrected vision because of this

15

uncorrected astigmatism.

If you or any of your care providers have any questions, please do not hesitate to have them contact me. I would anticipate that this will result in your being dispensed rigid gas-permeable contact lens so that when I see you back in a few months, then I can determine that you are seeing well in these lenses.

(Zwiers Aff., Dkt. #36-3 at p. 8 of 29.)

DCI's HSU called on September 20, 2010, to schedule Henley's contact lens fitting. On October 4, 2010, the sutures remaining in Henley's right eye were removed. University Station Clinic staff supplied Henley with ridged contact lenses for both eyes. Due to eye irritation, Henley was unable to put in the contact lenses for approximately two days. On October 26, 2010, Henley was seen by Lazorik who provided the rigid lenses to him.

Henley returned to GBCI on November 5, 2010. At that time, he had a prescription for rigid contact lenses, and he was allowed to possess the contact lenses at GBCI. Since receiving his contact lenses on, Henley has not experienced the impaired vision and associated headaches that he endured when wearing glasses and foregoing corrective lenses.

GBCI does not prohibit inmates from having contact lenses. GBCI follows Divison of Adult Institutions Policy 309.20.03 I, J, 12 which states contact lenses will not be permitted unless medically necessary and approved. Neither Zwiers nor Lemens took any action to provide Henley with access to the contact lenses. Dr. Richter justified his treatment plan to Zwiers during a brief portion of a five-minute conversation.

16

Henley was consulted frequently regarding his treatment options and had the opportunity to have his concerns addressed by HSU staff by submitting HSU requests through the prison communication system. Henley was seen by GBCI HSU staff and off-site treatment providers for various medical complaints and conditions approximately 55 times from his transplant on November 16, 2009 until his transfer to DCI on August 31, 2010.

### 2. Inmate Complaint Review System (ICRS)

On May 13, 2010, Henley submitted Offender Complaint GBCI-2010-10165, complaining that GBCI staff took his contact lenses away but that he was told by the UW Eye Station specialist that he was to wear contact lenses. Henley claimed that GBCI staff had taken his lenses and were trying to give him glasses, and he was having trouble seeing. Institutional Complaint Examiner Michael Mohr investigated the complaint and found that on April 23, 2010, Dr. Richter completed an optical exam for Henley, decided that the prescription for contacts should be ended, and requested that a new prescription using state-supplied eyewear be supplemented. Mohr further noted that Henley refused the glasses on May 10, 2010. Mohr stated that it was Dr. Richter's determination to make regarding what course of treatment to pursue and that, while Henley may not agree with that determination, it had been made based on years of education and experience. Mohr found that he was not in the position to either question or judge the merits, opinions, or treatments offered by the trained and professional HSU staff. He recommended that the complaint be dismissed with the modification that Zwiers be given a copy of the complaint. On May 17, 2010, acting as

17

reviewing authority, Thorpe reviewed Mohr's findings, followed his recommendation, and dismissed the offender complaint with modifications. Henley appealed the decision to the corrections complaint examiner's office, and on May 24, 2010, in agreement with the report of Mohr, Corrections Complaint Examiner Tom Gozinske recommended that GBCI-2010-10165 be dismissed. On July 24, 2010, the deputy secretary, Ismael Ozanne, dismissed the offender complaint.

On May 18, 2010, Henley submitted Offender Complaint GBCI-2010-10555, complaining that HSU staff was refusing to acknowledge his Health Service Requests to be seen by the physician for his eye. His complaint detailed the eye pain and irritation that he was experiencing. Mohr investigated plaintiff's complaint and found that Henley was informed that he would be seen in June. Mohr discovered that Henley was given eyewear for his vision problems but that he decided not to use it and returned the eyewear within one day of use. Mohr found that Henley received three different types of drop medications for his eyes and decided to return the medications too but, after examination by nursing staff, decided to accept the eye drop medications. Mohr was informed that Dr. Richter had consulted with Dr. Barney of the UW Eye Clinic before prescribing eyewear instead of contact lenses. Mohr found that he was not in the position to either question or judge the merits, opinions, or treatments offered by the trained and professional HSU staff. Based on his findings, he recommended that the complaint be dismissed with the modification to provide a missive from Nurse Wertel in five days. On May 24, 2010, as reviewing authority,

18

Thorpe reviewed Mohr's findings and, based on her review, followed the recommendation of Mohr and dismissed the offender complaint with modifications.

On June 12, 2010, Henley submitted Offender Complaint GBCI-2010-12447, complaining that Dr. Richter and HSU staff was refusing to do anything about the loose stitch in his eye. Mohr investigated the complaint and found that Dr. Richter and Dr. Barney were aware of Henley's complaint. Mohr noted that Henley was seen by Dr. Richter on June 4, 2010, where it was documented that Henley was belligerent and demanding regarding this issue of contact lenses. Mohr found that Henley had an upcoming appointment with the UW the next month and that, per Dr. Richter's evaluation, the scheduled appointment did not warrant a change. Mohr found that he was not in the position to either question or judge the merits, opinions, or treatments offered by the trained and professional HSU staff. On June 25, 2010, Mohr recommended that the complaint be dismissed with the modification that Zwiers receive a copy of the complaint. On June 28, 2010, Thorpe reviewed Mohr's findings, followed the recommendation of Mohr, and dismissed the offender complaint with modifications. Henley appealed the decision to the corrections complaint examiner's office, and on July 19, 2010, in agreement with the report of Mohr, Corrections Complaint Examiner Welcome Rose recommended that GBCI-2010-12447 be dismissed. On July 24, 2010, the deputy secretary, Ismael Ozanne, dismissed the offender complaint.

On July 29, 2010, Henley submitted Offender Complaint GBCI-2010-15611, complaining that Dr. Richter refused to issue Henley contact lenses. Mohr investigated

19

Henley's complaint and found that Dr. Richter had determined that contact lenses were not appropriate for Henley at that time. Mohr noted that Henley was post-corneal transplant and had been having issues with irritation due to lost sutures for which he had been seen by Dr. Barney with the UW and off-site by local optical providers. Mohr stated that it was Dr. Richter's determination to make regarding what course of treatment to pursue and that while Henley may not agree with that determination, it had been made based on years of education and experience. He found that he was not in the position to either question or judge the merits, opinions, or treatments offered by the trained and professional HSU staff. On August 16, 2010, Mohr recommended that the complaint be dismissed with the modification that Zwiers receive a copy of the complaint. On August 24, 2010, as reviewing authority, Thorpe reviewed Mohr's findings. Based on her review, Thorpe followed the recommendation of Mohr and dismissed the offender complaint with the modification that Zwiers would inform him when the optomologist evaluated the condition again and specifically indicated whether or not contacts were recommended. Henley appealed the decision to the corrections complaint examiner's office, and on September 13, 2010, in agreement with the report of Mohr, Corrections Complaint Examiner Tom Gozinske recommended that GBCI-2010-15611 be dismissed. On September 13, 2010, the deputy secretary, Timothy Lundquist, dismissed the offender complaint.

## III. ANALYSIS

### A. Dr. Richter's Motion for Summary Judgment

20

Dr. Richter contends that he is entitled to summary judgment because no genuine issue of material fact exists as to whether, (1) Henley lacks evidence of Dr. Richter's deliberate indifferent to a serious medical need; and (2) Henley lacks evidence that he suffered any injury or harm as a result of the course of treatment prescribed by Dr. Richter. According to Dr. Richter, by prescribing eyeglasses, he took reasonable measures to abate a substantial risk of harm to Henley. He contends that evidence that he and Dr. Barney disagreed as to Henley's course of treatment is insufficient to establish deliberate indifference.

Henley contends that summary judgment should be denied because each of Dr. Richter's arguments raise additional disputes of material fact. According to Henley, he was denied "medically indicated" treatment for approximately six months; Dr. Richter's after-the-fact justification for prescribing glasses raises disputed issues of material fact; refusing to follow the course of treatment prescribed by Dr. Barney demonstrated that Dr. Richter's indifference was deliberate; and Henley is not required to provide objective evidence of his symptoms.

## 1. Eighth Amendment Claim

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (internal quotation omitted)).

21

Prison officials violate the Constitution if they are deliberately indifferent to a prisoner's serious medical need. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A prisoner's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Arnett*, 658 F.3d at 750). In this case, the Court will focus of whether Dr. Richter was deliberately indifferent to Henley's medical need.

To demonstrate deliberate indifference, a plaintiff must show that defendants "acted with a sufficiently culpable state of mind," something akin to recklessness. *Arnett*, 658 F.3d at 751 (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Id.* (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Id.* (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It "is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 751 (quoting *Duckworth*, 532 F.3d at 679) (quotation marks omitted).

To show that Dr. Richter was deliberately indifferent, Henley needs to establish

22

that he was aware of but intentionally or recklessly disregarded his serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). According to Henley, Dr. Richter acted with deliberate indifference because he provided him glasses instead of contact lenses, as directed by Dr. Barney. However, Dr. Richter did follow Dr. Barney's recommendations as to Henley's right, surgical eye; as soon as the sutures in Henley's right eye were removed, he was fitted for rigid contact lenses. Henley points to no evidence which might suggest that Dr. Richter's treatment of his surgical eye was deliberately indifferent.

Following Henley's November 16, 2009 corneal transplant surgery, he wore a soft contact lens in his left, non-surgical eye and nothing in his right eye due to the sutures in the eye. On April 23, 2010, Dr. Richter determined that Henley should be provided with glasses because it would result in improved vision and provide protection to the right eye until the sutures were removed and he could wear rigid contact lenses in both eyes. Henley was provided with the glasses on May 10, 2010, but he refused them because he said that Dr. Barney had directed him to wear contacts. Henley agreed to try the glasses on May 17, 2010, but he did so for less than one day. He said he had distorted vision with and without the glasses. Henley saw Dr. Richter again on June 4, 2010, who advised him to wear the glasses. Henley saw Dr. Barney on July 13, 2010, who removed half of the sutures from his right eye and determined that the eye was still not ready for a contact lens because of the remaining sutures. After that appointment, Dr. Barney wrote a letter advising that for patients who

23

undergo corneal transplant for keratoconus, the use of rigid contact lenses following surgery is medically indicated. Dr. Barney also advised that, while at that time, Henley's right eye was not ready for contacts, he believed that left eye contact lens wear was medically indicated for best vision. During this time, Henley had consistent contact with the HSU and, at Dr. Richter's recommendation, he was even temporarily transferred to DCI where there was a full-time optometrist. The remaining sutures were removed on October 4, 2010, and on October 26, 2010, Henley was provided with rigid contact lenses for both eyes.

As indicated, Dr. Richter decided to provide Henley with glasses because he thought they would provide the best vision temporarily and to protect his right eye. In his deposition, Dr. Richter explained his rationale following a question from Henley's counsel asking if he considered prescribing Henley a rigid contact lens for his left eye. Dr. Richter answered as follows:

> Sure.
>
> . . .
>
> But not yet because we're not done. Remember, we have to get the right eye healed up. Then we fit the contact lens. Then we come back and do the left . . . .
>
> . . .
>
> Okay. So now we do it all at one time. I'm not going to send him down [to Madison] for five trips to fit the right eye and then send him down for five trips to do the left eye. That's going to cost everybody a lot of money.
>
> . . .

24

> That's ludicrous when he's got a pair of glasses to wear that he
> sees 20/20 with and he's got protection on the right eye.

(Thompson Supp. Aff. ¶ 2, Exh A at 122-23.)

The court defers to a medical professional's treatment decisions "unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008)). The record shows that Dr. Richter's treatment of Henley was grounded in professional judgment and was reasonable. *See Jackson*, 541 F.3d at 698; *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006). Even if Dr. Richter was wrong in prescribing glasses for Henley until his sutures were removed from his right eye and he could be fitted for contact lenses in both eyes, as long as he believed that he was providing appropriate treatment, he was not deliberately indifferent. *See Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

On the basis of this record, no reasonable juror could find that Dr. Richter was deliberately indifferent to Henley's serious medical need. *See Duckworth*, 532 F.3d at 681 (concluding that doctor who knew there was risk of cancer but erroneously thought that another condition was more likely causing prisoner's symptoms was not deliberately indifferent); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (explaining that difference of opinion as to prisoner's arthritis amounted to, at most, medical malpractice, and was not constitution violation). A good faith disagreement about the proper course of treatment will never prove deliberate indifference. *Norfleet*, 439 F.3d at 396; *Johnson*, 433

25

F.3d at 1012-13. Therefore, Dr. Richter's motion for summary judgment will be granted.

### 2. Medical Malpractice Claim

Dr. Richter also asserts that his motion relates to Henley's medical malpractice claim. However, apart from that statement in his summary judgment brief, the medical malpractice claim has not been addressed. Thus, summary judgment as to the state law claim will be denied.

### B. Zwiers and Lemens' Motion for Summary Judgment

Zwiers and Lemens contend that they are entitled to summary because they had no personal involvement in the decision to prescribe glasses instead of contact lenses to Henley. They further contend that they were not deliberately indifferent to Henley's serious medical needs. They concede that his corneal transplant constitutes a serious medical need, but contend that Henley cannot prove that they were deliberately indifferent to it.

Henley's claim against Zwiers and Lemens centers on their failure to intervene in Dr. Richter's allegedly unconstitutional treatment of Henley. However, the Court's finding that Dr. Richter is entitled to judgment on the claim forecloses Henley's claims against Zwiers and Lemens. Thus, their motion for summary judgment as to the Eighth Amendment claim will be granted.

Finally, Zwiers and Lemens acknowledge that they did not address Henley's medical malpractice claim and, therefore, summary judgment will be denied as to that claim.

**IT IS THEREFORE ORDERED** that defendants Zwiers and Lemens' motion

26

for summary judgment (Docket # 28) is **granted in part denied in part**. The motion is granted as to Henley's Eighth Amendment claim and denied as to his medical malpractice claim.

**IT IS FURTHER ORDERED** that defendant Richter's motion for summary judgment (Docket # 38) is **granted in part and denied in part**. The motion is granted as to Henley's Eighth Amendment claim and denied as to his medical malpractice claim.

**IT IS FURTHER ORDERED** that the plaintiff's motion to strike portions of the affidavit of John M. Thompson and James Richter, and corresponding proposed facts (Docket # 68) is **granted in part and denied in part** as described herein.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2013.

**SO ORDERED,**

**HON. RUDOLPH T. RANDA**
**U. S. District Judge**

27